# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 25, 2014 Session

## ALGIE LAVELL McCLURE v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Hamilton County**
**No. 271157   Rebecca J. Stern, Judge**

---

### No. E2013-00415-CCA-R3-PC - Filed June 2, 2014

---

The Petitioner, Algie Lavell McClure, appeals from the Hamilton County Criminal Court's denial of his petition for post-conviction relief, wherein he challenged his jury convictions for first degree murder, reckless endangerment, and aggravated burglary.  In this appeal as of right, the Petitioner contends that he received the ineffective assistance of trial counsel in the following ways: (1) by counsel's "opening the door" during his cross-examination of Kenya Houston to prejudicial testimony of the Petitioner's violent nature; (2) by counsel's failing to obtain Latasha Hinton's medical records showing her intoxication at the time of the shooting to impeach her identification of the Petitioner as the shooter; (3) by counsel's failing to present all law enforcement officers and accompanying reports as evidence that Ms. Hinton initially identified two, unknown black males as the perpetrators; (4) by counsel's failing to call an expert witness to challenge Ms. Hinton's identification of the Petitioner and to discredit the jailhouse informants; (5) by counsel's failing to adequately impeach several witnesses with the specifics of their prior criminal records; (6) by counsel's failing to review the jail records to verify the location of the jailhouse informant, Kordell Butler, at the time the Petitioner allegedly confessed to him; (7) by counsel's failing to interview the State's witnesses; (8) by counsel's failing to object to the State's improper closing argument; and (9) "in the manner that was presented" at the post-conviction hearings as testified to by the various witnesses.[1]  Following our review, we affirm the denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JEFFREY S. BIVINS, JJ., joined.

Lloyd A. Levitt, Chattanooga, Tennessee, for the appellant, Algie Lavell McClure.

---

[1] For the sake of clarity, we have re-ordered the issues presented by the Petitioner in his appellate brief and have also combined several claims that deal with the same issue.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; William H. Cox, III, District Attorney General; and Brian Finlay and Boyd Patterson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

In July 2005, a Hamilton County jury convicted the Petitioner of first degree premeditated murder, first degree felony murder, reckless endangerment, and aggravated burglary for the shooting death of Antonius Tuggle (the victim[2]) and the gunshot injury to his girlfriend, Latasha Hinton, that occurred at Tuggle's home on December 23, 2003. The Petitioner became a suspect based upon his association with the victim, their pending prosecutions as codefendants in a drug case, and reported threats made by the Petitioner to the victim regarding his urging the victim to take the blame in the drug case. See State v. Algie Lavell McClure, No. E2007-02556-CCA-R3-CD, 2008 WL 793787, at *1 (Tenn. Crim. App. Mar. 26, 2008). In the direct appeal opinion, this court recounted the trial testimony as follows:

Detective Phillip Steven Narramore of the Chattanooga Police Department testified that he executed a search warrant of the [Petitioner's] residence on August 30, 2002, where he found numerous handguns, drug trafficking equipment, and large sums of money as well as large amounts of cocaine, crack cocaine, marijuana and Ecstasy. The [Petitioner], the victim, and Edward Nunn were sitting in the kitchen in close proximity to where the items were found. Detective Narramore testified that the [Petitioner] was facing a "significant amount of time on [the] state level or federal level" if convicted for the drug offenses.

Mark "Little Man" Calhoun testified that the victim was his best friend for about six or seven years. He stated that he knew about the drug bust and that some time later, the victim received a phone call to come talk to the [Petitioner]. When they arrived at the Buster Brown Apartments to meet the [Petitioner], Calhoun stated that the [Petitioner] and the victim argued about the pending drug prosecution. He recalled that the [Petitioner] told the victim that the victim "needed to take care of the case . . . to clear [the Petitioner's] name because [the Petitioner] was already in enough stuff." Calhoun testified that the victim told the [Petitioner] that he would claim what was his part in the drug case but refused to take all the responsibility. Calhoun stated that the

---

[2] Antonius Tuggle will either be referred to as Mr. Tuggle or the victim in this opinion. We will refer to Latahsa Hinton as Ms. Hinton.

argument went on for some time and ended with the [Petitioner's] telling the victim, "well, I'm going to handle this in my own hands," which Calhoun understood to mean "no witnesses, no case." Calhoun also testified regarding a similar incident that occurred at the B & B Market. He stated that the [Petitioner] again threatened to "handle it in the streets" when the victim refused to take the blame for the drugs. Calhoun testified that, after the shooting death of the victim, the [Petitioner] saw him on Greenwood Drive and told him, "I'll get you too."

Kenya Houston testified that she was the victim's girlfriend in August 2002 when the drug arrests occurred. She recalled several arguments between the [Petitioner] and the victim regarding the [Petitioner's] attempts to get the victim to take the full blame for the drugs. She stated that the victim "was only going to accept charges for what he had, his things." On cross-examination, Houston acknowledged that she never heard the [Petitioner] threaten the victim and added that she did not know if the victim was afraid of the [Petitioner] but that "[h]e didn't like having the conversations." She also stated that the [Petitioner] was not normally a threatening individual. After making this statement, the [S]tate confronted her with her prior statement to Detective Ir[v]in that the [Petitioner] is the kind of person who "just [does not] deal with problems that he [does not] have to deal with. If he has to shoot you or what he feel[s] like he [has] got to do to take care of the problem, I know he will do that." She also acknowledged that she had previously told the police that the [Petitioner] is "known for using violence against people, shooting to hurt people" and that he is "feared a lot by some people."

Monica Preston testified that she lived next door to the victim in a duplex when the shooting occurred. She recalled that she was asleep at around 9:00 p.m. when her daughters came into her room because they had heard a loud thump at the victim's residence. She went to the kitchen and heard something that sounded "like a firecracker" at least two times. She looked out her window, but she did not see anything unusual. She heard a woman screaming but assumed that the victim and his girlfriend were arguing so she went back to bed. She did not realize what had happened until the police arrived.

Christie Rhodes was a store clerk at B & B Market in late 2003. She knew the victim as a frequent customer of the store. She witnessed an altercation between the [Petitioner] and the victim. When she heard loud yelling out in the parking lot she looked out the window to see the victim grab the [Petitioner] and "shove him up against the window of the store." She could not understand what they were saying but could tell by their actions that

they were arguing. She went to the door and told them that they could not be fighting in the parking lot, so they stopped and nothing further happened. She stated that both men came into the store together to apologize to her for scaring her.

Thomas Trotman testified that he was a recovering crack cocaine addict and a resident of the Hamilton County Jail. He stated that the [Petitioner] had hired him to do some work around his house about two and half years ago. About three months after beginning to work for the [Petitioner], drug task force members approached Trotman with hopes that he would "wear a wire and try to make a buy off" the [Petitioner]. He declined the task force's offer and later told the [Petitioner] about the meeting because he "didn't feel good about it." A few months later, the [Petitioner] told Trotman that he appreciated what he had done by not working with the task force. Trotman testified that the [Petitioner] also told him that the narcotics detectives had told the [Petitioner] that the victim was "telling on him." Trotman acknowledged that he had prosecutions pending at the time of his testimony, but he stated that he had been promised nothing in exchange for his testimony and was only there because he had been subpoenaed.

Brian Herman, a federal prisoner serving a twenty-three year sentence for drug offenses, testified that he has known the [Petitioner] about ten years. He recalled that the [Petitioner's] girlfriend contacted him for bail money when the [Petitioner] was arrested in August 2002. After the [Petitioner] made bail, the [Petitioner] and Herman met for dinner. In reference to the drug case, Herman testified that the [Petitioner] told him, "[t]hese bitches always want to hop up on the stand, we need to start killing these bitches. [The victim] thinking he [is] going to make it [to] trial, you know, he ain't going to make it to trial. I'm going to make sure he [is] dead before trial, either I [will] or I'll have somebody to do it." Later that night, Herman and the [Petitioner] ran into the victim at a party. After talking to the victim, the [Petitioner] told Herman, "[m]an, he ain't acting right. . . . He needs to just step up and take this charge before the feds get it. You know, if he [does not] take this charge, I'm going to be messed up. You know, he ain't going to make it to trial." On yet another occasion, when Herman went to the [Petitioner's] home to buy a puppy, the [Petitioner] told Herman that the victim would not make it to trial and threatened, "I'll make sure he's dead before he get[s] a chance to testify." Herman also testified that he had seen the [Petitioner] with many guns during the course of their friendship and that a Glock pistol was his favorite.

Herman testified that he only wanted to tell the truth with no expectation or promise of any deal, although he did have hopes of "[m]aybe a leaner sentence." He acknowledged that his guilty plea in federal court

-4-

included language that if he rendered "substantial assistance" to the government he could be recommended for a downward departure in the length of his sentence. He reiterated that he had been promised nothing, but he admitted that he was testifying in other matters in Hamilton County Criminal Court in hopes of receiving a downward departure based upon substantial assistance. On redirect examination, Herman stated that if he testified untruthfully he would risk an increase in his sentence and that he had lost a friend in the [Petitioner] by testifying truthfully at the trial.

Latasha Hinton, the victim's girlfriend at the time of his murder, testified that she dated the victim for about six or seven months. She realized he was a "dope dealer" about two or three months into the relationship based upon the traffic in and out of the apartment and the phone calls he regularly received. She said that she knew the [Petitioner] through the victim but had only seen him a few times before the murder. She recalled a conversation between the two men when the [Petitioner] accused the victim of talking to the police, an accusation the victim denied. Although she never heard any specific threats, she stated that the victim was upset by the conversation. She testified that on the night of December 23, 2003, as she and the victim were getting ready for bed, she heard a loud boom. The victim ran to the front door and [Ms.] Hinton followed behind him. She testified that the [Petitioner] pushed in the door and shot them both. She recalled that the victim attempted to wrestle the gun from the [Petitioner] after he had been shot. The [Petitioner] continued shooting the gun as they wrestled. The [Petitioner] started to leave but when the victim got back up, the [Petitioner] came back into the apartment and shot the victim again. [Ms.] Hinton was screaming hysterically and the [Petitioner] turned and shot at her two or three times, hitting her once in the hip. After she was shot, she looked at the victim and realized that he had his own revolver and was attempting to shoot the [Petitioner]. At his point, the [Petitioner] fled the apartment. [Ms.] Hinton admitted to testifying previously that she had no knowledge of any drugs in the house, but at trial she testified that she "cleaned up [the] dope, weed and money" by throwing it in the backyard after calling 911. She denied telling the police that they were shot by two masked men, but she admitted that she did not name the [Petitioner] because she could not remember his name when she gave her initial statement.

Chattanooga Police Department Officer Jamie Riddle testified that she was dispatched to the scene of the homicide on December 23, 2003. Upon arrival, she and another officer noticed that the front door to the residence had been kicked in. They also saw the victim rolling on the living room floor with a gunshot wound to his chest. Officer Riddle testified that a hysterical woman later identified as [Ms.] Hinton came running down the hallway and they

ordered her to the ground while they secured the scene and radioed for emergency medical services. Officer Riddle began CPR on the victim but he died in "less than a minute." [Ms.] Hinton told the officers that two black men kicked the door in and took off. Officer Riddle stated that [Ms.] Hinton acted "very vague and [would] just try to get [her] attention somewhere else" when asked questions regarding the suspects' descriptions. On cross-examination, Officer Riddle recalled that [Ms.] Hinton did not name anyone when asked who had shot them. She also stated that a revolver with one empty casing was found in the hallway.

Crime Scene Investigator Gregory Mardis of the Chattanooga Police Department testified that he collected thirty-eight separate items from the crime scene, including bags of narcotics and cash. Investigator Mardis identified photographs of bloodstains in the kitchen, hallway, and on the victim's socks. He also identified photographs of tire tracks found at the scene, evidence of the kicked in front door, marij[ua]na, and drug paraphernalia found in the residence and in the backyard. Several nine millimeter and .45 caliber shell casings were found in the residence. He acknowledged on cross-examination that an examination of the tire tracks was nonproductive and that no fingerprint evidence or gunshot residue analysis was performed on evidence at the crime scene. The crime scene examination revealed six shots from a nine millimeter handgun and one shot from the .357 handgun that was found at the scene.

Tom Layne of the Chattanooga Police Department testified that he was a patrol supervisor in December 2003 and responded to the call regarding the shooting. Upon his arrival, he confirmed that the scene was secure and began assisting in the treatment of the victims. He recalled sending [Ms.] Hinton's description of the suspects to dispatch for a city wide bulletin and that it only referred to two black males with no reference to masks or any other clothing.

Chattanooga Police Department Crime Scene Investigator Tracy McGhee testified regarding the condition of the scene. He described the locations of bullet holes, bullets and shell casings found throughout the apartment. He also described where blood evidence was found in the apartment. Investigator McGhee stated that no latent fingerprint evidence was found at the scene.

Doctor Frank King testified in his capacity as the Hamilton County Medical Examiner regarding the victim's injuries and cause of death. Testifying from the report of Dr. Stan Kessler, a board certified pathologist working in the Hamilton County Medical Examiner's Office at the time of the victim's autopsy, Dr. King concluded that the victim suffered gunshot wounds to his chest and right hip. Dr. King testified that the victim died as a result of

hemorrhaging from the wounds, particularly the chest wound. He concluded, however, that either wound would have been fatal.

Don Carmen with the Tennessee Bureau of Investigation testified that he performed ballistics testing on evidence recovered at the scene. His testing confirmed that the .38 caliber ammunition recovered at the scene had been fired from the .357 magnum Taurus revolver. Testing also revealed that the nine millimeter ammunition was not fired from the nine millimeter semi-automatic pistol found at the scene. Carmen explained that although the nine millimeter ammunition had been fired by the same pistol, it was not fired from the pistol submitted for his examination. He also examined two .45 caliber bullets that were recovered and determined that they had been fired from the same .45 caliber pistol. Such a pistol was not found during the investigation. Therefore, Carmen concluded that three firearms were involved in the offense.

Charles Hardy testified as an expert in serology employed by the TBI Crime Lab. A comparison of samples taken from the victims and the blood stain evidence recovered at the scene revealed that blood stain evidence from the living room, hallway, and bedroom door frame matched the sample from Tuggle. The blood stain evidence from the laundry room and backdoor step matched the sample from Hinton.

Kordell Butler testified that he is a federal inmate serving his tenth year of a fifteen year sentence for felony possession of a firearm and drug distribution. He stated that he met the [Petitioner] while at the Hamilton County Jail awaiting to testify in an unrelated murder prosecution. While the two men were housed together in an isolation cell, the [Petitioner] related to Butler what happened the night of the offense. Butler testified that he led the [Petitioner] to believe that he was also awaiting trial for a murder. Through the course of their conversations, the [Petitioner] told Butler that "he do[es] dome shots," meaning that the [Petitioner] preferred to shoot victims in the head but not the chest. During one conversation, Butler told the [Petitioner] "man, you know you killed that guy." Butler claimed that the [Petitioner] indicated that he had killed the victim but added that "the only thing they got is the bitch," referring to Hinton being the primary [S]tate witness. Butler testified that a few weeks later he asked the [Petitioner] what happened and he told Butler that "he kicked the door in, shot the guy and the girl and some kind of way the guy got back up, got a gun and started shooting at him and he ran out." Butler also testified that he overheard the [Petitioner] on the telephone preparing an alibi regarding a trip to a Walgreens. Butler acknowledged that he contacted the district attorney general in hopes of a reduced sentence, but he also stated that he had never been promised anything for his testimony.

Seneka Gaines testified that her sister, Latasha Hinton, spoke to her as she was going into surgery on the night of the offense. She related that [Ms.] Hinton told her that [Mr.] Tuggle was in the living room and that she was in the kitchen when the [Petitioner] kicked in the door and began shooting, contrary to [Ms.] Hinton's testimony that they were both in the back bedroom when the defendant entered the apartment. A portion of a taped interview of Gaines taken December 24, 2003 was played for the jury wherein Gaines indicated that [Ms.] Hinton identified the [Petitioner] as the assailant.

Investigator Charles Martin of the Chattanooga Police Department testified that he was the lead investigator in the Tuggle homicide. Investigator Martin testified that the [Petitioner] turned himself in on January 6, 2004. He acknowledged on cross-examination that the victim's house could be considered a drug house and that it was not uncommon for residents at such places to be victimized by robberies, thefts and drug-related assaults. He also acknowledged that the [Petitioner] became a suspect based upon the interview with Gaines that indicated her sister named the [Petitioner] as the perpetrator. He added that [Ms.] Hinton identified the [Petitioner] from a photographic lineup at a later date.

Shawn Bailey testified for the [Petitioner] that he picked up the [Petitioner] in Nashville on December 23 and that they arrived in Chattanooga at approximately 6:45 in the evening. Bailey testified that they went to a Walgreens to pick up some medicine for his baby. While there, the [Petitioner] saw a friend and spent about twenty minutes talking to him before they left to deliver the medicine to the [Petitioner's] baby's mother, Carmen. After staying at Carmen's home for forty-five minutes to an hour, Bailey and the [Petitioner] drove around and visited a friend, Ramon O'Neal, in the East Chattanooga and Brainerd Road area of town. Bailey testified that he dropped off the [Petitioner] at about 10:00 p.m. and that they never drove near the area where the murder took place. On cross-examination, Bailey acknowledged that he could have been on house arrest on December 23, but he added that he could have been a fugitive for violation of house arrest at that time as well.

Ramon O'Neal testified that the [Petitioner] stopped by his house at approximately 8:40 p.m. on December 23 because he was looking for an automobile title. O'Neal stated that they talked for about twelve or thirteen minutes. He recalled looking at a clock when the [Petitioner] left that reflected it was 8:56 p.m. On cross-examination, O'Neal denied speaking with the [Petitioner] as late as 9:45 p.m. He also admitted that the [Petitioner] telephoned him some time after his arrest and told him he might need to come to court to testify for him.

-8-

Wiley Render testified that the [Petitioner] called him on December 23 and asked for a ride. He could not remember the exact time but estimated that it was sometime from 8:00 to 9:30 p.m. He recalled that they spent about twenty to thirty minutes together before Render dropped the [Petitioner] off in the Brainerd Road area. On cross-examination, the [S]tate confronted Render with his prior statements that the [Petitioner] could not have telephoned him for the ride any later than 8:20 p.m. and that the [Petitioner] did not call him as late as 9:00 p.m. Once confronted with these statements, Render admitted that he really was not sure of the time but that "[i]t was late dark." On redirect, Render was even unsure of the exact date of his contact with the [Petitioner], stating "I don't know, you know, 23rd, 24th or 22nd, you know, I'm not for sure."

Wilma Brown, the [Petitioner's] aunt, testified that the [Petitioner] visited her on the evening of December 23. She recalled that he visited at approximately 9:00. She figured the time because her son was not home from work yet but got off work at 9:00 and arrived home shortly after the [Petitioner] arrived. She stated that the [Petitioner] visited for thirty to forty-five minutes before leaving. She recalled that her son said he was leaving at about the same time, but she did not know if they went anywhere together. On cross-examination, Brown acknowledged that the [Petitioner] could not be "two places at one time" so if someone else had testified he was elsewhere at 9:00 that person was wrong.

Reginald Gilmore, the [Petitioner's] uncle, testified that the [Petitioner] came by the place he was staying on December 23 sometime between 10:00 and 11:00 p.m. and that the [Petitioner] stayed there with Gilmore all night. On cross-examination, Gilmore explained that he was staying with someone next door to Wilma Brown at the time.

Wendy Christopher testified that she met the [Petitioner] at a night club about three years prior to her testimony at trial. She also stated that she grew up in the same neighborhood as [L]atasha Hinton. She related a conversation with [Ms.] Hinton that occurred a few months after the offenses when she asked how [Ms.] Hinton was doing after her injuries. Christopher stated that [Ms.] Hinton told her that two masked men entered the home and killed her boyfriend. Christopher also testified that [Ms.] Hinton told her that she did not know who the assailants were. On cross-examination, Christopher admitted that she had been convicted of theft and conspiracy to sell cocaine in the past. She also admitted that her conversation with [Ms.] Hinton occurred about one month after the offenses had occurred when she ran into [Ms.] Hinton at a gas station. She recalled that [Ms.] Hinton was holding hands with a small child about to put the child into a car seat and that there were two other young

-9-

children already in the car. She also acknowledged that [Ms.] Hinton did not really know her or her cousin that well and had not seen them in several years. Christopher testified that [Ms.] Hinton acted like "she was keeping it real brief, that she didn't want to talk about it" when asked questions about the offenses.

The [Petitioner] denied that he had any problems with the victim and described the statements of witnesses as "just a hype everybody [was] putting out." He claimed that he never threatened the victim to take responsibility for the drug charges and never threatened any violence against the victim. He testified that the B & B Market clerk, Christie Rhodes, lied about an altercation between him and the victim. He stated that when the victim was killed he became a suspect within two days. He related that he called the police and turned himself in on January 6, about the time when court resumed in Hamilton County. The [Petitioner] testified that he returned from Nashville on December 23 and went to Walgreen[]s to pick up a prescription for his girlfriend. He stated that he went to Ramon O'Neal's house after taking the prescription to his girlfriend. He visited several friends during the evening because he had been out of town for about a week. He remembered getting a phone call sometime after 10:00 p.m. that the victim had been killed. The [Petitioner] denied killing the victim or having him killed.

On cross-examination, the [Petitioner] admitted that he was facing felony drug and handgun charges in the August 2002 case involving the victim. When asked if he was better off without the victim alive for trial, the [Petitioner] insisted that his case would be better with the victim alive. He also indicated that he had filed a speedy trial motion in 2002, but the case had still not gone to trial. He also indicated that he was not concerned that the victim was going to testify against him. The [Petitioner] acknowledged some inconsistencies regarding time in his alibi witnesses' testimony. He insisted that he was with Wiley Render sometime after 10:00 p.m. when he received the phone call that the victim had been shot. The [Petitioner] added that he visited with Mike Jackson and Kirk Smith after leaving Render's house and ending up at his aunt's house sometime after 11:15 p.m. The [Petitioner] also stated that he never told anyone about his alibi witnesses because, he claimed, no one would listen to him.

The [S]tate presented several rebuttal witnesses. Brandon Patterson, a pharmacy clerk at Walgreens, testified that a prescription in the [Petitioner's] girlfriend's name was picked up at 5:55 p.m. on December 23. Steven John Beluchi, a physical therapist, testified that he worked at the same therapy office where [Ms.] Hinton received therapy after her injuries. Although she was not his patient, Beluchi observed that in February 2004, Hinton required

crutches to walk and was unable to drive a car, contrary to Christopher's
testimony about her conversation with [Ms.] Hinton. Dr. Katie Lunn testified
as an expert in physical therapy and also treated [Ms.] Hinton. She stated that
[Ms.] Hinton would have been unable to walk or drive a car as described by
Christopher's testimony.

McClure, 2008 WL 793787, at *1-8. Following the jury's guilty verdicts, the two murder
convictions were merged, and the trial court imposed an effective sentence of life
imprisonment plus two years for the Petitioner's convictions. Id. at *1.

On direct appeal to this court, the Petitioner raised the following issues: that there was
insufficient evidence to support his convictions; that the trial court erred in admitting
evidence of numerous prior bad acts of the Petitioner through multiple witnesses; that the
trial court erred in admitting certain impeachment evidence; and that the trial court erred by
not giving a credibility instruction relative to expectations of favorable treatment certain
witnesses may have had in exchange for their testimony. Id. This court affirmed, and the
Petitioner did not seek review of that decision with our supreme court.

The Petitioner, with the assistance of counsel, then filed a timely petition for
post-conviction relief. Two amended petitions were also filed. In those petitions, the
Petitioner raised numerous allegations of ineffective assistance of counsel at trial, including
the following:

1. Trial counsel was ineffective "by opening the door to extremely damaging
and prejudicial testimony of Kenya Houston";
2. Trial counsel was ineffective for "failing to obtain the EMT and/or
paramedic reports or any medical records" concerning Latasha Hinton, which
evidenced Ms. Hinton's impairment due to drugs and alcohol at the time of the
shooting and provided the initial description she gave of the shooters;
3. Trial counsel was ineffective "in failing to cross-examine any witnesses
about prior felony convictions or crimes involving dishonesty or false
dealing";
4. Trial counsel was ineffective "in failing to review any jail records to verify
the location of the 'jail snitches' at the time of the alleged conversations with
the [Petitioner], to determine if they were in the same cell as [the Petitioner]
during the relevant time period";
5. Trial counsel was ineffective "in failing to interview [S]tate witnesses";
6. Trial counsel was ineffective "in failing to subpoena to trial Officer Irvin,
Officer Sean Morris, Officer Watkins, all of whom would have testified that
Latasha Hinton either indicated that an unknown suspect kicked in the front

-11-

door or that she had previously stated that two black males had kicked open the door";

7. Trial counsel was ineffective "in failing to subpoena the police report of Officer Charles Martin[,]" which indicated that Ms. Hinton described the assailants to Sgt. Layne as two black males, and trial counsel could have used this report to refresh Sgt. Layne's recollection;

8. Trial counsel was ineffective "in failing to present law enforcement witnesses to testify that Latasha Hinton gave a statement that two masked men were the perpetrators" and by promising the jury during opening statement that he would present such evidence;

9. Trial counsel was ineffective "in failing to object to [the State's] closing argument";

10. Trial counsel was ineffective "in failing to present an expert witness in eyewitness identification";

11. Trial counsel was ineffective "in failing to present all witnesses that were told by Latasha Hinton that the perpetrator of the crime was two unidentified black males";

12. Trial counsel was ineffective "in failing to further question [S]tate witnesses concerning their criminal felony convictions, and convictions involving dishonesty and false dealings";

13. Trial counsel was ineffective "in the manner that was presented" at the various post-conviction hearings.

Several hearings were held in the post-conviction court.[3]

Trial counsel was first asked if he recognized two investigative police reports. Trial counsel stated that he did, and those reports were entered into evidence. The first report was prepared by "Sgt. Johnson,"[4] and he reported that "Hinton told first officers (Watkins) that two black males kicked in the front door." The second report, prepared by "Inv. B. Russell," provided the following statement, "Ofc. Watkins advised Latasha stated two black males had kicked open the door to the duplex and had shot Antonius and her." Trial counsel could not recall whether either he or his investigator ever spoke with Officer Watkins prior to the Petitioner's trial. It was stipulated that Officer Watkins was subpoenaed to the Petitioner's

---

[3] We will limit our recount to the testimony relevant to the issues of ineffective assistance of counsel presented.

[4] Several of the officers in these reports are never identified by their first names at any of the post-conviction hearings.

trial and was prepared to testify consistent with his statements in the report, but he was not called as a witness.

Trial counsel was then asked if he considered Officer Watkins' testimony significant, and trial counsel responded that "[i]t had already come out that other folks were going to testify [to] that" and that Officer Watkins' testimony "would have been repetitive." Furthermore, trial counsel stated that Ms. Hinton was impeached at trial with her contradictory, initial statements about the identity of the perpetrators. Trial counsel was then asked if having multiple witnesses to testify to Ms. Hinton's initial statements would have been helpful for the Petitioner's defense, and he replied,

> No, that would be ridiculous because it was going to come out that and she admitted that she had said two black males before and we had people that had come up that stated two black males. So having a line of people coming up that said she said two black males beforehand had changed their story, that was uncontroverted and there's no reason to put on another officer to go ahead and put down what was already going to be admitted.

Trial counsel continued, "We got her in other ways as well[.]"

When asked if he had interviewed any of the State's witnesses, trial counsel said that he "interviewed a couple of them[,]" that the investigator spoke with "[m]ost of them[,]" and that he listened to the investigator's recordings of the interviews. Trial counsel then clarified that he was actually referring to interviews with defense witnesses, not State's witness, and that typically most State's witnesses are not cooperative with the defense. Trial counsel stated that his investigator interviewed the Petitioner's alibi witnesses and that he reviewed the alibi with the Petitioner. He stated that he also reviewed the detectives' reports prior to the Petitioner's trial and asserted that he and his investigator "knew what the detectives were going to state." Trial counsel then testified that he possibly spoke with one of the detectives personally but, due to the passage of time, could not recall any details of an interview.

Trial counsel confirmed that he had a list of the State's witnesses and was aware of who would testify at trial. He was then questioned specifically about several of the State's witnesses. Regarding Det. Narramore, trial counsel confirmed that he "knew exactly what he was going to testify to" because they had a "pretrial hearing on him." Trial counsel could not recall who Mark Calhoun was or what he testified to at the Petitioner's trial. When read Calhoun's trial testimony, trial counsel agreed that it was "significant[,] going towards . . . motive[.]" He likewise could not recall who Monica Preston was or her testimony at the Petitioner's trial.

-13-

Trial counsel was then asked about Kenya Houston and the Jencks material he received for this witness following her direct testimony at the Petitioner's trial—a prior statement Houston had made to Detective[5] Jason Irvin. A review of the trial transcript revealed that, at the outset of trial counsel's cross-examination of Houston, counsel stated that he had just received Houston's statement and that he was "just now reading over [her] statement." Trial counsel testified at the post-conviction hearing that he did not request a recess to review Houston's statement because it "wasn't that long[.]" Houston's trial testimony was then reviewed with trial counsel.

At the Petitioner's trial, trial counsel examined Kenya Houston, asking her on cross-examination if, in her opinion, the Petitioner was "normally a threatening individual?"; Houston responded, "No, sir." The prosecutor approached the bench and stated, "I wasn't going to ask her about this, but she just testified that she knew [the Petitioner] wasn't a threatening individual. That's exactly the opposite of what she said in her statement, so now I am going to impeach her on it." The court permitted the inquiry, and the following colloquy then took place between Houston and the prosecutor:

> Q. In your statement to the police, ma'am, when asked about [the Petitioner], you said, "I'm not saying that [Mr. Tuggle] did but I just know he was always upset, like I said, so [Mr. Tuggle] know [sic] what kind of person [the Petitioner] is." Did I read that correctly?
> A. Yes.
> Q. Then Detective Irvin asked you, "When you say that, you said a while ago what kind of person do you know [the Petitioner] to be." Your answer was, "You know, I mean he don't deal with -- he just don't deal with problems that he don't have to deal with. If he has to shoot you or whatever he feel like he got [sic] to do to take care of the problem, I know he will do that."
> Did I read that correctly?
> A. Yeah.
> Q. When Detective Irvin again asked you, "Okay. And like you said before [the Petitioner] is known for using violence against people, shooting to hurt people."
> What was your answer?
> A. Yes.

---

[5] This officer is frequently referred to as a detective throughout the testimony at the post-conviction hearing and at the Petitioner's trial. However, he testified that he was a sergeant at the post-conviction hearing. For the sake of consistency, we will refer to him as a detective.

Q. And you said, "I mean he is feared a lot by some people around here including myself." Is that correct?

A. Yeah.

Trial counsel then re-cross examined Houston and asked,

Q. Now, even though you made that statement and everything, did you feel threatened by [the Petitioner] at that time?

A. No, I didn't.

Q. So basically that State is not putting it in the entire right context, correct?

A. I mean, I didn't say that he -- I said that he didn't -- he never said it to me that he feared him but I just know he avoided the conv-- he didn't want to have the conversations with him.

Q. Right. You never heard [the Petitioner] make any threats towards Mr. Tuggle?

A. No, sir.

Following the review of Houston's testimony, trial counsel stated that he did not recall any of the specifics of that testimony. When asked if he opened the door to prejudicial testimony about the Petitioner, trial counsel stated, "[S]he basically stated that first off that [the Petitioner] wasn't threatening and reiterated if I remember correctly. . . . But on that, no, I don't think she hurt us." He agreed that Houston's testimony was likewise not helpful to the defense because "she went both ways."

Trial counsel did not recall speaking with Christie Rhodes or Thomas Trotman.

Trial counsel was then informed that two State's witnesses, Trotman and Brian Herman, both in custody at the time of the Petitioner's trial, had prior criminal records. Trial counsel acknowledged these prior criminal histories, asserting his belief that the State "brought up their criminal histor[ies]." Trotman was asked about his "pending cases" at the Petitioner's trial, but the details of these cases were not provided to the jury. Trotman's twenty pending cases were listed at the post-conviction hearing, charges for accessory after the fact, fraudulent use of a credit or debit card, theft of property, burglary, aggravated burglary, criminal impersonation, reckless endangerment, evading arrest, and aggravated assault. These cases were in the same trial court and prosecuted by the same district attorney as the Petitioner's case. Trial counsel reiterated his belief that "[w]e had already brought that out though" and that, whether "it's one or one hundred[,]" the point was to establish the witness had a reason to lie, which was done in Trotman's case. Trial counsel further noted that Trotman had not yet been convicted in those cases. When asked if he should have made

-15-

the jury aware of the jailhouse informants' convictions, trial counsel said, "I felt that it was more strongly to go ahead and put out the fact that these guys were testifying in favor for a lower sentence."

Mark Calhoun's prior criminal history was then reviewed with trial counsel, and it was noted that Calhoun had convictions for felonious theft of property, felonious selling of cocaine, aggravated assault, and criminal impersonation. However, Calhoun was not in custody at the time of trial. Trial counsel also did not recall any details of Monica Preston's criminal record, although it was noted that she had convictions for theft and passing worthless checks. Trial counsel stated that his normal practice was to review the criminal histories of trial witnesses, although he could not recall if he had done so in this case. Questioning on this issue focused on the fact that trial counsel did not delve into the specifics of these witnesses' criminal histories, asking about each conviction.

Questioning turned to the witness Kordell Butler, who testified at the Petitioner's trial that the Petitioner confessed to him while they were in jail together. It was noted that the trial transcript reflected that Butler was serving a fifteen-year sentence at the time of Petitioner's trial for felony possession of a firearm and drug distribution, with only "[t]hree years and a few months" left to serve. Trial counsel was asked if he remembered researching any of Butler's other criminal history, and trial counsel said that he focused on the witness's motive lie for a lighter sentence, rather than additional convictions. Trial counsel further opined, "records don't matter" and that "it's more damaging to show that this person ha[d] a reason to lie[.]" Reference was made to Butler's prior convictions, and his record was entered into evidence.

Also, it was noted that Butler was supposed to testify against another prisoner in a murder prosecution and that was why he was housed in the same facility as the Petitioner; however, the prosecutor confirmed that Butler was never used as a witness in that trial. Trial counsel could not remember checking jail records to determine if the Petitioner and Butler were ever confined together at the same facility. Trial counsel then said that he was not familiar with any way to verify whether two prisoners were together while incarcerated in the same jail. However, trial counsel did recall the Petitioner's telling him that he was never confined in the same area with Butler, and trial counsel believed the Petitioner testified to such at trial. When asked if records would have been helpful to confirm the Petitioner's assertion, trial counsel replied, "[W]e already showed that he had reason to lie." Trial counsel said that he did not request jail phone records either because he did not believe that "would come into play" due to the fact that the Petitioner denied knowing Butler.

Butler's letters to the State were reviewed with trial counsel and admitted into evidence; the first letter is dated December 7, 2004, and the last letter is dated March 7, 2005.

It appeared from the trial transcript that trial counsel had several of Butler's letters in his possession as he cross-examined Butler at the Petitioner's trial. However, trial counsel did not receive the letters until following Butler's testimony on direct examination. In the letter dated March 4, 2005, Butler wrote that he overheard the Petitioner talking about an alibi and trying to get witnesses to establish that alibi. Trial counsel stated that "the primary thing that [he] was going after [Butler] on was . . . the information that he was giving as to [the Petitioner] didn't match the evidence from the crime." Trial counsel opined that Butler's testimony was not "damaging at all" because "[h]is facts did not fit with the facts of the case, and it was obvious that he was testifying just trying to get a reduction in his sentence."

Trial counsel was then asked if he had ever reviewed Latasha Hinton's medical records when she was transported to the hospital following being shot, but trial counsel could not recall those specific records. The medical records were entered into evidence, showing that Ms. Hinton tested positive for cocaine, methamphetamine, and marijuana upon arrival to the hospital. The State noted that, although the document provided that Ms. Hinton tested positive at that time, there was no information regarding the levels of those drugs in her system; in other words, it was unknown if her drug usage was on the night of the shooting or sometime prior to that night.

Trial counsel was asked if evidence of drugs in Ms. Hinton's system at the time she was shot would have been important evidence to use to impeach her identification of the Petitioner, and trial counsel said,

> But it wouldn't affect her memory on the stand. And I mean she had already gone ahead -- and plus that would have been something to use to impeach the fact when I said two black men but I was under the influence of drugs and then have her up here saying but now that I'm out of the influence of drugs it's [the Petitioner].

Trial counsel explained that his strategy was to provide evidence to the jury that Ms. Hinton first identified two black males, and only later the Petitioner, and he did not want to call into question that initial identification by putting on proof of her impairment. Trial counsel noted that evidence of her original identification of two black males was presented at trial through cross-examination of Ms. Hinton and her statements to law enforcement. Trial counsel agreed that Ms. Hinton denied at the Petitioner's trial ever making any statements identifying anyone other than the Petitioner.

Portions of trial counsel's cross-examination of Ms. Hinton were read into the record. Trial counsel asked Ms. Hinton the following questions at the Petitioner's trial:

Q. Had you been taking drugs that night?
A. Yeah, I smoked some weed.
Q. And you told Mr. Pope[6] earlier, that's another lie, because you told him at the preliminary hearing that you didn't smoke weed?
A. You said at the time of accident. At the preliminary hearing, no, I don't smoke weed anymore but at the time, that night, yes, I smoked some weed.

Trial counsel continued to insist that further inquiry into Ms. Hinton's impairment that evening would have hurt the defense. At a subsequent post-conviction hearing, trial counsel testified, although somewhat contradictory to his prior testimony, that Ms. Hinton's prior statement that she had not been using drugs that night would have been good impeachment evidence. This second statement was made under the assumption that he never inquired about Ms. Hinton's drug usage at trial.

Trial counsel was then asked about testimony at the Petitioner's trial that Ms. Hinton was shown an eight-person photographic array and that she identified the Petitioner therein. Trial counsel did not remember receiving any information that Ms. Hinton was shown only one photograph, rather than eight. Trial counsel further opined that, if that occurred, such evidence was of only limited value due to the fact that Ms. Hinton knew the Petitioner personally and that her identification had already been impeached.

Trial counsel stated that he did not remember whether either he or his investigator spoke with the State's ballistics expert prior to the Petitioner's trial. Trial counsel's memory was then refreshed about the ballistics expert's trial testimony that the 9mm shells found in the residence did not match the 9mm weapon found at the scene. The firearms report was entered as an exhibit; it reflected that Mr. Tuggle was shot with .45-caliber weapon. An emergency room medical record of Ms. Hinton's was also entered into evidence, wherein a 9mm weapon was referenced.

Questioning then turned to the State's closing argument at trial. Trial counsel agreed that it would be improper for the State to argue general deterrence, "in other words, you need to send a message to criminals that and to convict people charged with crimes in order to send a message to the community." The exact statement from the closing argument was quoted: "Who knows how many criminals are thinking about, hey, no witness, no case. Is that a good little business practice? They are watching this case right now to see what you do." A second, allegedly improper statement was then quoted, "A lot of people have stepped up to do this. You saw the fear I'm sure in some of their eyes and they are shaking. I know

---

[6] Mr. J. William Pope was the Petitioner's lawyer at a prior bond revocation hearing, not the preliminary hearing as Ms. Hinton's testimony suggests.

I did." Trial counsel acknowledged that this second statement was also in error but testified that he did not object to these statements "because it looks like you're trying to hide something from the jury."

Trial counsel was then asked why he inquired about the Petitioner's criminal record in his direct examination of the Petitioner at trial. At trial, the Petitioner testified that he had a felony conviction for reckless endangerment and several misdemeanor convictions. Trial counsel agreed that these misdemeanor convictions were likely not admissible otherwise. However, according to trial counsel, this evidence may not have helped the Petitioner's defense, but "it didn't necessarily hurt either." Trial counsel continued,

> And plus you don't want to look like if something comes up like you're lying to the jury. At this time our main defense was that he has nothing to hide, he did not do this, we were putting on an alibi and that basically there was nothing to go ahead and tie him to the shooting that night.

In summary, trial counsel stated that the point of asking the Petitioner about these convictions was to convey to the jury that the Petitioner was "an honest, truthful person[.]"

Trial counsel testified that he visited the crime scene and took photographs. When asked what the theory of the defense was, trial counsel stated,

> The theory was that [the Petitioner] was with other people and that Ms. Hinton first stated that there was something that she didn't know who did it and then later on named [the Petitioner]. . . . And basically the police went after him because he's the only one they could find that really had [a motive] to go after Mr. Tuggle . . . . And that basically they'd suggested to Ms. Hinton and she's one that -- that's why she said two unknown black men that that's why they named [the Petitioner].

Trial counsel stated that he had numerous meetings, "more than five[,]" with the Petitioner while he was incarcerated.

On cross-examination, trial counsel testified that he had practiced law for over seventeen years and that the majority of his work was in criminal cases. Trial counsel stated that he did file a motion in limine to "keep out some of the evidence of all the drugs" that were found in the Petitioner's house and that he was successful to some extent. Trial counsel confirmed that evidence of the Petitioner's pending drug case was admitted because it was relevant to motive and that there were multiple witnesses who testified about the Petitioner's motive to kill the victim.

-19-

Trial counsel agreed that evidence that Ms. Hinton initially "told the officers that two black men kicked the door in and took off" came in through other witnesses. Therefore, Det. Irvin would not have contributed new information according to trial counsel. Also, according to trial counsel, Det. Irvin likely would have also testified "to the rest of Latasha Hinton's statement that [the Petitioner's] name is mentioned immediately . . . in that same conversation."

The Petitioner testified to his perceived deficiencies in trial counsel's representation. The Petitioner detailed his incarceration with Kordell Butler, stating that, while the Petitioner was incarcerated at the Hamilton County Jail, he was moved to isolation with Butler "for no apparent reason[.]" The Petitioner stated that he was not aware of the letters Butler had written to the prosecutor prior to trial and that he only saw the letters after Butler testified.

Regarding Ms. Hinton's identification, the Petitioner testified that there were "some statements made during this preliminary hearing that [he] felt should be exposed to the courts to let them know . . . this [was] suggestive identification."[7] The Petitioner believed that based on this evidence of suggestive identification techniques, coupled with the information contained in the police reports that Ms. Hinton initially said that two, unknown black males kicked in the door and shot the victim, trial counsel should have filed a motion to suppress Ms. Hinton's identification of him. According to the Petitioner, he asked trial counsel to obtain Ms. Hinton's medical records, including her toxicology report and information on what type of bullet she was shot with, if it was the same caliber as the bullets found in Mr. Tuggle.

From the Petitioner's standpoint, he and trial counsel were "having difficulty communicating on the case[.]" The Petitioner felt like they were unprepared to go to trial. He wanted trial counsel to subpoena jail phone records to impeach Butler's testimony, and these records would have established that Butler got his information from someone else according to the Petitioner. The Petitioner also claimed that Butler had gone through his cell when the Petitioner left for visitation and that this was how Butler obtained the information, by looking through documents in the Petitioner's cell. The Petitioner believed that the jail kept records of which inmates were on which floors, and he also wanted trial counsel to obtain these housing records to discredit Butler. The Petitioner averred that he never discussed this case with Butler.

The Petitioner confirmed that trial counsel met with him "quite a few times," but they were more like "social visits" according to the Petitioner. The Petitioner said there were

---

[7] A tape of the preliminary hearing was admitted as an exhibit to the post-conviction hearing, but it is not included in the appellate record.

"probably a good four or five meetings that were probably about business." The Petitioner's investigator also came to the jail twice to meet with him. The Petitioner consistently testified that he wanted trial counsel and his investigator to further investigate his alibi and interview those witnesses. Moreover, the Petitioner said that his request for them to interview the State's witnesses was not honored; trial counsel did not "contest[] any of the information that [the State was] putting out." Specifically, the Petitioner asked that trial counsel go speak with Latasha Hinton, Christie Rhodes, the store clerk, and "Stephanie" in "Buster Brown apartments." The Petitioner asserted that he also asked trial counsel to conduct criminal background checks on the witnesses, and that request was likewise not honored. According to the Petitioner, trial counsel told him Kordell Butler's "record[] was sealed" and that, therefore, trial counsel did not have much information on Butler. The Petitioner summarized that he felt like he "didn't get a thorough investigation."

According to the Petitioner, he felt like the State's closing argument "wasn't proper at all." The Petitioner was disgruntled that trial counsel did not object to the improper statements in closing arguments.

On cross-examination, the Petitioner confirmed that he had been convicted of selling drugs, assaultive offenses, weapons offenses, and that he was, therefore, familiar with the criminal justice system. The Petitioner agreed that Ms. Hinton had seen him once before the shooting but insisted that the photographic identification was suggestive. The Petitioner stated that he provided trial counsel with a list of alibi witnesses, including names and phone numbers, and told trial counsel about places he went on the evening of the shooting. The Petitioner confirmed that trial counsel "showed" him the alibi witnesses' statements and asserted that he pointed out any discrepancy to trial counsel in those statements. The Petitioner further stated that Butler possibly could have obtained details of the shooting from the newspaper.

Chattanooga Police Department Detective Jason Irvin was called to testify. He stated that he assisted Investigator Charles Martin with the investigation into the December 23, 2003 shooting and that he was present when Inv. Martin interviewed Ms. Hinton at the hospital "just an hour after the shooting happened." Det. Irvin recalled that, at that time, Ms. Hinton was highly sedated and in a lot of a pain, so they "[c]ouldn't get a lot out of her." Initially, Ms. Hinton told Det. Irvin that "she was in the bed with Mr. Tuggle when an unknown suspect kicked in the front of the residence at 7714 Nautical Way." Later in the interview, Ms. Hinton mentioned the Petitioner's name to the officers, and Det. Irvin stated that was "how [the Petitioner] came up as a suspect in the case." Det. Irvin then read from a report he prepared,

> [Ms.] Hinton told me the incident involved guns and drugs. [Ms.] Hinton stated the unknown party arrested with Mr. Tuggle was poorly upset with him and had put a contract on his life. Ms. Hinton stated the contract to kill Mr. Tuggle was reportedly $5,000. Ms. Hinton never mentioned the [Petitioner's name] during this conversation. Ms. Hinton stated he was involved in some way with the issue.

Det. Irvin agreed that the logical inference from the report was that Ms. Hinton "felt like [the Petitioner] was involved in some way, not that he was the shooter." "[A] couple of days" later, Det. Irvin accompanied Inv. Martin to interview Ms. Hinton again at the hospital, where she was recovering following surgery. Det. Irvin confirmed that he was subpoenaed to the Petitioner's trial but was not called as a witness.

Lieutenant Gene Coppinger of the Hamilton County Sheriff's Department testified that, in 2004 or 2005, there would have been taped recordings of inmate's phone calls from the Hamilton County Jail that could have been subpoenaed. However, those records were no longer available at the time of the post-conviction hearing. Lt. Coppinger reviewed the jail assignments and was able to determine that the Petitioner and Kordell Butler were housed together at "[s]ix northeast segregation[,]" also known as isolation, from September 17, 2004, through October 18, 2004. Lt. Coppinger described that area of the jail, "This particular housing area is set up in four cells that are individual with a common walkway or a common exercise area and a common shower. . . . And a common phone that would have been right outside of in that walkway." The inmates were allowed out of their cells separately for one hour a day in the morning and then again in the afternoon. If an inmate remained in the housing area while out of his cell, his cell door remained open according to Lt. Coppinger.

Lead Investigator Charles Martin, Jr. testified about the photographic array shown to Ms. Hinton. Inv. Martin said that Ms. Hinton was shown eight photographs and that he was not aware of any law enforcement officer's showing Ms. Hinton a single photograph prior to that time. He agreed that, if such had been done, it was not standard protocol. Inv. Martin opined, "I do believe that without [Ms. Hinton's] testimony there would have been very little evidence to convict [the Petitioner]."

Inv. Martin was questioned about a report he prepared, wherein he stated that "Sgt. Layne . . . was one of the responding officers and he advised that upon his arrival the female victim told him that two black males forced entry into the residence and immediately began shooting, striking her and the other victim." Inv. Martin confirmed that his report was correct, and the report was admitted as an exhibit. He also agreed that his field offense report indicated that the two suspects were strangers to Hinton. This report was also introduced into

-22-

evidence. He did not recall ever being interviewed by trial counsel or the Petitioner's investigator prior to the Petitioner's trial.

At a final hearing on the petition, the Petitioner offered testimony from Daniel Kane, an attorney licensed in Atlanta, Georgia, as an expert in criminal defense. Mr. Kane never spoke with trial counsel prior to the post-conviction hearing, instead reviewing documentation from the Petitioner's trial and the transcripts of the previous post-conviction hearings at the request of post-conviction counsel.

Mr. Kane first described what he believed to be the perceived deficiencies with trial counsel's cross-examination of Latasha Hinton, specifically the lack of questioning about the toxicology report and Ms. Hinton's medical records. Mr. Kane also noted trial counsel's failure to call Det. Irvin, Officer Watkins, Sgt. Johnson, and Inv. Russell—officers who were present on the scene and reported Ms. Hinton's initial identification of two unknown assailants. Mr. Kane opined that questioning Ms. Hinton about this information would have significantly impacted her credibility with the jury. Also the ballistics evidence could have been challenged more thoroughly according to Mr. Kane.

Mr. Kane was then asked what more trial counsel could have done with regard to the impeachment of Kordell Butler. Mr. Kane thought trial counsel should have developed Butler's "significant" criminal history by submitting certified copies of those convictions. Mr. Kane further opined that the jail records would have provided further impeachment evidence of Butler. Mr. Kane described Butler as "a professional witness" who "knows how to get his time cut." Additionally, Mr. Kane said that trial counsel should have specifically inquired about Thomas Trotman's twenty pending cases to show the witness's bias. Putting on evidence of these criminal histories was "critical" in Mr. Kane's opinion.

Regarding Kenya Houston, Mr. Kane stated that trial counsel "opened the door" on cross-examination to Houston's prior statement to Det. Irvin, which "was very damaging" and "hurt [the Petitioner] severely." According to Mr. Kane, the tape of Houston's prior interview with Det. Irvin was played for the jury following this line of questioning. Mr. Kane opined that trial counsel should have asked for a recess to review the statement before proceeding with cross-examination and that, if he had done so, then trial counsel likely would not have asked the same question to open the door.

The final thing Mr. Kane noted was that trial counsel did not interview the State's witnesses, apparently not even making an attempt to do so. This failure was inexcusable in Mr. Kane's opinion.

On cross-examination, Mr. Kane confirmed that he was not licensed to practice law in Tennessee, never trying a case in a Tennessee state court. Mr. Kane stated that the documentation he reviewed included the toxicology reports and the ballistics reports. He agreed that he did not see the "entire discovery" in the Petitioner's case. Additionally, Mr. Kane had spoken with the Petitioner prior to the hearing.

Mr. Kane agreed that often State's witnesses decline to speak with defense attorneys. However, Mr. Kane was concerned that trial counsel never even made an attempt to do so.

On redirect examination, Mr. Kane opined that the Petitioner suffered prejudice from trial counsel's failures. He stated, "Absolutely. I think the trial was a mess." Mr. Kane thought the Petitioner would not have been convicted but for trial counsel's errors.

The Petitioner also proffered an expert in identification testimony, Dr. Jeffrey Neuschatz. Dr. Neuschatz testified about how memory works and that memories may change over time. He also described the ideal conditions for memory to function best. According to Dr. Neuschatz, memory or identification is susceptible to impairment when someone is distracted, is under stress, the view is obstructed, the viewing is only for a short period of time, or the witness is of a different race than the person being identified, and these conditions can lead to inaccurate testimony. Dr. Neuschatz said that jurors are unaware of these issues and that an expert in eyewitness identification is helpful. He also testified that his testimony may have made a difference in the Petitioner's case.

Dr. Neuschatz then testified about the relevance of an individual's confidence in his or her identification, stating that confidence does not necessarily correlate to accuracy. According to Dr. Neuschatz, when confidence occurs "further away from the identification, the correlation goes down even more." Also, high stress situations and facial coverings can impact identification. Moreover, when a weapon is involved, people tend to focus on the weapon, known as "a phenomenon called weapon focus." He opined that Ms. Hinton's identification of the Petitioner appeared to have been affected by several of these factors.

Dr. Neuschatz also testified about "post-event suggestion[,]" which is based upon the information an individual collects after the event. If an individual receives information from a source viewed as credible, then the individual may incorporate that information into that person's memories according to Dr. Neuschatz. Dr. Neuschatz then described unconscious transference, also known as the bystander effect: "if someone's in the area or someone looks like the person who committed the crime, if they're later put in a line-up they may be identified as the person who did it." When asked about the effect of a person's intoxication on identification, Dr. Neuschatz said that intoxication "harms encoding and makes it more difficult for [a person] to remember stuff accurately later." He opined that smoking

marijuana may have affected Ms. Hinton's identification accuracy, as would cocaine and methamphetamine usage in his opinion.

Dr. Neuschatz then described "an area called expectation in relation to line-ups" as "the idea that [the individual] believe[s] the person who committed the crime is in the line-up." He noted that law enforcement usually take precautions to reduce expectation; however, expectation "increases the likelihood that someone's going to choose out of the line-up." Dr. Neuschatz detailed the Department of Justice Guidelines for Conducting Proper Unbiased line-ups and opined that these procedures were not followed in Ms. Hinton's identification, which again increases the chance of misidentification. He also noted that Ms. Hinton's "viewing time" of the shooter appeared to be relatively short.

On cross-examination, Dr. Neuschatz confirmed that he had never spoken directly with Ms. Hinton and that his opinion was based upon a review of the record. He could not say whether Ms. Hinton's identification was actually correct in this case.

On redirect examination, Dr. Neuschatz was asked about his research on jailhouse informants. From his research, he determined, "juries tend to believe that regardless if they're getting incentive, regardless if they've testified 20 times in the past. In my research, . . . they're very convincing to juries." Dr. Neuschatz opined that "juries have a lot of trouble putting themselves in the place of people in jail[.]" According to Dr. Neuschatz, informants "are not the most credible people" because "they're getting paid for their testimony."

By order filed on January 9, 2013, the post-conviction court made extensive findings of fact and determined that the Petitioner did not meet his burden of proving deficient performance that prejudiced the outcome of the proceedings. This appeal followed.

ANALYSIS

On appeal to this court, the Petitioner contends that trial counsel failed to provide the effective assistance of counsel at trial guaranteed to him by the United States and Tennessee constitutions. Specifically, the Petitioner contends that he received the ineffective assistance of trial counsel in the following ways: (1) by counsel's "opening the door" during his cross-examination of Kenya Houston to prejudicial testimony of the Petitioner's violent nature; (2) by counsel's failing to obtain Latasha Hinton's medical records showing her intoxication at the time of the shooting to impeach her identification of the Petitioner as the shooter; (3) by counsel's failing to present all law enforcement officers and accompanying reports as evidence that Ms. Hinton initially identified two, unknown black males as the perpetrators; (4) by counsel's failing to call an expert witness to challenge Ms. Hinton's identification of the Petitioner and to discredit the jailhouse informants; (5) by counsel's failing to adequately

impeach several witnesses with the specifics of their prior criminal records; (6) by counsel's failing to review the jail records to verify the location of the jailhouse informant, Kordell Butler, at the time the Petitioner allegedly confessed to him; (7) by counsel's failing to interview the State's witnesses; (8) by counsel's failing to object to the State's improper closing argument; and (9) "in the manner that was presented" at the various post-conviction hearings by the witnesses' testimony.

Petitions for post-conviction relief are governed by the Post-Conviction Procedure Act. Tenn. Code Ann. §§ 40-30-101 to -122. To obtain relief, the petitioner must show that his conviction or sentence is void or voidable because of the abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The petitioner must prove his factual allegations supporting the grounds for relief contained in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(2)(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is clear and convincing when there is no substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

The post-conviction court's findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. See State v. Nichols, 90 S.W.3d 576, 586 (Tenn. 2002) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)); see also Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). The petitioner has the burden of establishing that the evidence preponderates against the post-conviction court's findings. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). This court may not re-weigh or reevaluate the evidence or substitute its inferences for those drawn by the post-conviction court. Nichols, 90 S.W.3d at 586. Furthermore, the credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the post-conviction court. Bates v. State, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).

Ineffective assistance of counsel claims are regarded as mixed questions of law and fact. State v. Honeycutt, 54 S.W.3d 762, 766-67 (Tenn. 2001). Thus, the post-conviction's findings of fact underlying a claim of ineffective assistance of counsel are reviewed under a de novo standard, accompanied with a presumption that the findings are correct unless the preponderance of the evidence is otherwise. Fields, 40 S.W.3d at 458 (citing Tenn. R. App. P. 13(d)). The post-conviction court's conclusions of law are reviewed under a de novo standard with no presumption of correctness. Id.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland, 466 U.S. at 687; see Lockart v. Fretwell, 506 U.S. 364, 368-72 (1993). In other words, a

-26-

showing that counsel's performance was deficient is not enough; rather, the petitioner must also show that but for counsel's deficient performance, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Strickland standard has also been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. See Henley, 960 S.W.2d at 580. The performance prong requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness or was "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability means a probability sufficient to undermine confidence in the outcome." Id. Failure to satisfy either prong results in the denial of relief. Id. at 697.

Both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation includes the right to "reasonably effective" assistance, that is, within the range of competence demanded of attorneys in criminal cases. Strickland, 466 U.S. at 687 (1984); Burns, 6 S.W.3d at 461; Baxter, 523 S.W.2d at 936. In reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

On appeal, the Petitioner contends that trial counsel was ineffective, raising the allegations outlined above. We will address each in turn.

*I. Kenya Houston's Testimony*

First, the Petitioner argues that trial counsel rendered ineffective assistance "by opening the door to extremely damaging and prejudicial testimony of Kenya Houston" during his cross-examination of the witness. The Petitioner contends that, if trial counsel had been thoroughly prepared, he would have already interviewed this witness prior to trial, or at the very least, have previously reviewed her statement. At the post-conviction hearing, trial counsel testified that, although he did not see the statement until trial, Houston's statement

was short and that, therefore, he did not need a recess to review the document.[8] Trial counsel further opined that Houston's testimony did not "hurt" the defense because she was insistent on her belief at trial that the Petitioner was not a threatening individual. The Petitioner's criminal defense expert disagreed that Houston's testimony was not hurtful and opined that trial counsel should have asked for a recess to review the statement.

The post-conviction court found that trial counsel rendered deficient performance in this regard, concluding, "[C]ounsel did 'open the door' to the damaging [testimony of Kenya Houston] that, though not usually threatening, the [P]etitioner is intolerant of problems and uses violence to resolve them." The Petitioner argues that this testimony was prejudicial "especially in light of trial counsel . . . inexplicably bringing to the attention of [the jury the Petitioner's] prior conviction for [r]eckless [e]ndangerment and [p]ossession of a [w]eapon." The State responds that no prejudice resulted from trial counsel's failure "in light of the other evidence concerning the other informants' testimony and the [Petitioner's] motive and intent to harm [Mr.] Tuggle." Moreover, the State notes that "the jury had already been exposed to 'essentially the same' information from other sources" and that "the record was rife with specific instances of prior bad conduct" without Houston's statements.

Trial counsel testified that he only received the statement as Jencks material following Houston's direct examination; however, he explained that he did not need a recess to the review the statement because it "wasn't that long of a statement." Trial counsel opined that Houston's testimony was neither helpful nor hurtful because "she went both ways[,]" testifying that the Petitioner was both threatening and non-threatening. Deference is only made to trial strategy and counsel's tactical choices when they are informed decisions based on adequate preparation. See Hellard, 629 S.W.2d at 9. Trial counsel only reviewed Houston's just following her direct examination. He then inquired about her belief of the Petitioner's threatening nature, which led to Houston's impeachment with her previous statement of the Petitioner's intolerance for problems and his violent nature. Thus, we conclude that there is no evidence showing that counsel made the tactical decision or weighed the consequences of questioning Houston about Petitioner's character. We agree with the post-conviction court that this was deficient performance because his decision was not based on adequate preparation. See, e.g., Clarence Nesbit v. State, No. W2009-02101-CCA-R3-PD, 2013 WL 1282326, at *55 (Tenn. Crim. App. Mar. 28, 2013) (concluding that there was no evidence showing counsel made an informed decision based on adequate preparation where counsel questioned a witness about petitioner's reputation for peacefulness and, thus, opened the door to a satanic worship allegation), perm. app. denied, (Tenn. Aug. 13, 2013). However, on redirect examination, Houston stated her opinion that she never felt

_____

[8] A copy of the statement was not introduced at trial, nor is one included in these post-conviction proceedings.

threatened by the Petitioner and that she never heard the Petitioner make threats toward Mr. Tuggle. Moreover, we likewise agree with the State that the record of was rife with similar testimony of prior bad acts by the Petitioner. See McClure, 2008 WL 793787, *1-8, 10-11. Thus, we conclude that the Petitioner has failed to show any prejudice from trial counsel's failure.

## II. Latasha Hinton's Identification

The Petitioner submits that trial counsel was deficient for failing to obtain Ms. Hinton's medical records. He also argues that trial counsel was ineffective for failing to subpoena all law enforcement officers to testify about Hinton's prior identification of the assailants and for failing to subpoena Inv. Martin's report stating the same and, further, in making a promise to the jury during opening statement that evidence from law enforcement would be presented.

### A. Medical records

In this regard, the Petitioner contends that trial counsel "rendered ineffective assistance of counsel in failing to obtain the EMT and/or paramedic reports or any medical records to determine whether Latasha Hinton gave any description of the person who shot her and Antonius Tuggle." He continues, "these records could have contained information regarding whether Ms. Hinton was impaired on alcohol or drugs."

Ms. Hinton's toxicology report, produced at the post-conviction hearing, showed that she tested positive for cocaine, methamphetamine, and marijuana following being shot in the hip.[9] The Petitioner submits that trial counsel should have used this record to impeach Ms. Hinton's accounts of the events. However, it is clear from the record that trial counsel did question Hinton about her drug usage at trial, and she acknowledged that she had smoked marijauna that evening. The Petitioner further notes that, at a revocation hearing concerning a prior sentence of the Petitioner's, Ms. Hinton stated, under oath, that she did not use drugs on the day of the shooting, contrary to the information in the report, and that this information would have been valuable impeachment evidence. The Petitioner's criminal defense expert testified that, in his opinion, had the jury been advised of Ms. Hinton's toxicology report, "she would have lost all credibility" in the eyes of the jury.

---

[9] Also admitted at the post-conviction hearing was an emergency department record, which indicated that Ms. Hinton stated that she was "shot from approximately five feet away" and that she was in "a sitting position when shot." The Petitioner further introduced a physician's assessment record into evidence, wherein Ms. Hinton indicated to the physician that she was shot from five to ten feet away. The post-conviction court determined, "[T]he [P]etitioner does not identify any inconsistency in any description of the perpetrator(s) in the records and emergency-room records, . . . merely and variously indicate that, according to the patient, she was shot from about five feet and from about five to ten feet." The Petitioner makes no argument regarding these two documents in his brief on appeal.

-29-

The State submits that trial counsel's decision in this regard was a strategic choice and that the Petitioner "makes this contention without showing any correlation between the substances consumed and the victim's ability to record or relate an accurate description." The State further asserts that Ms. Hinton "admitted prior drug use and admitted lying about it on cross-examination."

The post-conviction court ruled, "[A]s the [S]tate notes, the correlation between positive results on drug tests for marijuana, methamphetamine, and cocaine and impairment is not clear." The post-conviction court continued, "With respect to Ms. Hinton's impeachment with her testimony at the preliminary hearing . . . , the [P]etitioner does not specify the nature of any inconsistency. In any event, counsel did impeach her with her denial of drug use at a bond revocation hearing . . . ." Importantly, it does appear from the record that trial counsel brought the issue of Ms. Hinton's intoxication to the jury's attention by getting Ms. Hinton to admit that she smoked marijuana that evening. This would have only been confirmed by introduction of her medical records. It was also brought to the jury's attention that Ms. Hinton had previously lied about her intoxication. The Petitioner implies repeatedly that the jury was completely unaware of this information, which is untrue. Furthermore, we agree with the post-conviction court and the State that the levels of cocaine and methamphetamine in her blood were not sufficiently correlated to Ms. Hinton's usage of those substances on the evening of the shooting. The Petitioner has failed to show deficient performance in this regard.

### B. Failure to Call Law Enforcement Officers and Present Accompanying Report

The Petitioner argues that trial counsel was ineffective "in failing to present law enforcement witnesses to testify that Latasha Hinton gave a statement that two masked men were the perpetrators." Regarding law enforcement officials that should have been called to impeach Ms. Hinton's testimony, the Petitioner submits that trial counsel was ineffective "in failing to subpoena to trial Officer Irvin, Officer Sean Morris,[10] Officer Watkins, all of whom would have testified that Latasha Hinton either indicated that an unknown suspect kicked in the front door or that she had previously stated that two black males had kicked open the door." Furthermore, he contends that trial counsel was ineffective "in failing to subpoena the police report of Officer Charles Martin[,]" which indicated that Ms. Hinton described the assailants to Officer Layne as two black males and that trial counsel could have used this report to refresh Officer Layne's recollection at trial. Finally, he argues that trial counsel told the jury during opening statement that he would present law enforcement officers to testify to Ms. Hinton's statements and that trial counsel failed to fulfill that promise to the jury.

---

[10] Officer Morris was not called at the post-conviction hearing, and we will not speculate what his testimony would have been. See Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

The State responds that "additional evidence of the victim's initial identification of two black strangers would have made no difference in the outcome." The State argues that "[p]resenting more evidence of her prior identification in the face of her denial at trial would not have advanced the [Petitioner's] alibi defense." The State notes that trial counsel "pointed out inconsistencies in the description of events, and her concealment of evidence that she initially said had been stolen."

The post-conviction court ruled on these various issues surrounding Ms. Hinton's identification as follows:

> With respect to additional evidence of Ms. Hinton's initial description of the perpetrators as two black males . . . , the evidence regarding her initial description of the number of perpetrators could have been more clear. One officer testified at trial that he "recalled sending [her] description of the suspects to dispatch for a city wide bulletin" and "it only referred to two black males with no reference to masks or any other clothing." []McClure, [2008 WL 793787, at *4]. Another officer testified that Ms. Hinton was hysterical and "acted 'very vague and [would] just try to get [her] attention somewhere else' when asked questions regarding the suspects' description." Id.[] (brackets in original). Ms. Hinton herself denied telling police that there were two masked men but explained that she could not remember the [P]etitioner's name. Id. at *[3]. She described the shooter's attire as including a grey toboggan. . . . The [P]etitioner did not become a suspect until the next day when Ms. Hinton's sister told police that, to her, Ms. Hinton had identified the [P]etitioner as the shooter. [Id. at *6].
>
> One or more police reports do use the term "unknown" or "strangers" in reference to the suspects. It is not clear, however, whether the terms were Ms. Hinton's or represent an inference by police from her initial failure to name anyone.
>
> . . . .
>
> . . . [C]ounsel [did not] exploit all the changes in Ms. Hinton's account of the perpetrator(s). To police at the scene, she described the perpetrators as two black males. To police at [the] hospital, she named the [P]etitioner not as the shooter but as someone who had offered five thousand dollars for Mr. Tuggle's death. To her sister at [the] hospital and thereafter to police, she named and identified the [P]etitioner as the shooter. The initial statement to police at [the] hospital renders her explanation at trial of her failure immediately to name the [P]etitioner as the shooter, a failure immediately to recollect his name, inadequate and makes her eventual identification of the [P]etitioner seem less like an identification than an inference of guilt.

-31-

Our review of the trial record reflects that Latasha Hinton denied ever "telling the police that they were shot by two masked men, but she admitted that she did not name [the Petitioner] because she could not remember his name when she gave her initial statement." McClure, 2008 WL 793787, at *3. Officer Riddle was called at trial and testified that, initially, Ms. "Hinton told officers that two black men kicked the door in and took off." Id. at *4. Officer Riddle further stated that Ms. "Hinton acted 'very vague and [would] just try to get [her] attention somewhere else' when asked questions regarding the suspects' descriptions." Id. Officer Layne "recalled sending Hinton's description of the suspects to dispatch for a city wide bulletin and that it only referred to two black males with no reference to masks or any other clothing." Id.

The post-conviction court stressed that "the evidence regarding [Hinton's] initial description of the number of perpetrators could have been more clear." However, while there was certainly additional evidence that could have been presented, we agree with trial counsel's testimony that the evidence was put before the jury. Trial counsel did fulfill his promise during opening statement. Also, attacking Ms. Hinton's credibility was part of the defense theory at trial. Furthermore, we also cannot see why Officer Layne's recollection would have needed to be refreshed with Inv. Martin's report at trial; he testified to Ms. Hinton's initial description. While this additional information offered by the Petitioner at the post-conviction hearing may have further discredited Ms. Hinton, the jury was not unaware of the details of her original identification of two, unknown black males as the perpetrators. The Petitioner does a good job of confusing the nature of the testimony, and we are not as convinced that trial counsel rendered deficient performance.

Information challenging Ms. Hinton's identification of the Petitioner was presented to the jury. This court determined that the evidence was sufficient on appeal. See McClure, 2008 WL 793787, at *8-9. The Petitioner's allegation simply amounts to a claim that trial counsel should have done more. We agree with the post-conviction court that the Petitioner has failed to establish that he was prejudiced in this regard.

### III. Identification Expert

The Petitioner next contends that trial counsel was ineffective by failing to present an expert in identification testimony to challenge Ms. Hinton's identification of him and the credibility of the jailhouse informants. The Petitioner did present Dr. Neuschatz at the post-conviction hearing, who offered testimony on issues of memory, eyewitness identifications, and line-up identifications. Dr. Neuschatz opined that this type of expert testimony would have been helpful to the jury and could have impacted the jury's decision. Dr. Neuschatz also testified about his research concerning jailhouse informants. In an attempt to attack the jail informants' credibility, the Petitioner notes in his brief that Dr. Neuschatz testified that, "[f]rom the little research that he had done on jail house informants, . . . it was disheartening

that juries tend to believe these type of witnesses regardless if they are getting incentives or have testified in the past." The State responds that the Petitioner "failed to show that an expert on eyewitness identification would have made a difference[,]" noting that "[t]he Petitioner was not a stranger to either victim" and that "[t]he witnesses were placed before the jury and challenged by counsel."

The post-conviction court determined, "With respect to the lack of expert evidence on eyewitness identification . . . , it is not clear that counterintuitive factors affect identifications of non-strangers as much as identification of strangers. In any event, there are reasons unrelated to observation and memory to doubt the identification." At the post-conviction hearing, the Petitioner presented an expert witness on identification who testified extensively about the problems with memory and eyewitness identification and also about the inherent lack of credibility of jailhouse informants. As the post-conviction court previously noted in addressing a separate issue, "the evidence regrading [Ms. Hinton's] initial description of the number of perpetrators could have been more clear." In 2000, our supreme court had rejected the claim that expert testimony on the reliability of eyewitness identification was admissible. See State v. Coley, 32 S.W.3d 831 (Tenn. 2000). Coley was the law until State v. Copeland, 226 S.W.3d at 287, 300-301 (Tenn. 2007), where our supreme court overruled Coley's per se ban on the admission of such evidence. In this case, the Petitioner's trial occurred in 2005, and thus, trial counsel cannot be deemed deficient for failing to call an expert witness when such testimony had been determined to be inadmissible at that time by our supreme court.

Moreover, Copeland does not require the admission of the testimony of an eyewitness identification expert but instead holds that such testimony is not per se inadmissible. Troy Allen Pruitt v. State, No. M2012-00897-CCA-R3-PC, 2013 WL 1858783, at *5 (Tenn. Crim. App. May 2, 2013), perm. app. denied, (Tenn. Sept. 10, 2013) (citation omitted). This court has said that the evidentiary rule announced in Copeland has "limit[ed] retroactive application to the case in which it is announced." Id. at *5 (citation omitted). Additionally, after holding that such expert testimony was admissible, the Copeland Court then undertook a harmless error analysis, but because the testimony of a single eyewitness was the crux of the case against Copeland, the high court found that the exclusion of the testimony could not be classified as harmless error. 226 S.W.3d at 302-03. Such is not the case here.

Finally, although we are unsure of the reliability of Dr. Neuschatz's testimony regarding jailhouse informants under the test announced in McDaniel v. CSX Transportation, Inc., 955 S.W.2d 257 (Tenn. 1997), Dr. Neuschatz himself stated that juries are likely to believe jailhouse informants regardless of their motives and incentives to testify. The Petitioner failed to show deficient performance in this regard.

## IV. Prior Felony Records

In this regard, the Petitioner, citing to Tennessee Rule of Evidence 609, submits that trial counsel was ineffective "in failing to cross-examine any witnesses about prior felony convictions or crimes involving dishonesty or false dealing" and, similarly, that trial counsel was ineffective "in failing to further question [S]tate witnesses concerning their criminal felony convictions, and convictions involving dishonesty and false dealings." He first notes that Trotman "could have been thoroughly questioned about the twenty pending cases that he had" in the same trial court with the same prosecutor. He asserts that "[t]his would have been proper impeachment to show bias or motive for his testimony in the hopes of getting favorable treatment from the State on his pending cases." He then notes that his criminal defense expert "was critical of trial counsel's failure to present the criminal histories of the State's witnesses" and that bringing those criminal histories to the attention of the jury was "absolutely critical." Mr. Kane stated, "With Kordell Butler particularly, it wasn't done." In addition to Trotman's criminal history, the Petitioner also introduced evidence of Mark Calhoun's and Brian Herman's criminal histories at the post-conviction hearing. Testimony concerning Butler's criminal history was provided at the post-conviction hearing.

The State replies that "[e]vidence of the criminal records in this case likewise would have had a negligible effect on the verdict." The State submits that "[a] review of the trial record clearly indicates Trotman's statements concerning the [Petitioner] were already of limited probative value" and notes that Trotman's criminal past was pointed out to the jury, suggesting that Trotman's presence at the Petitioner's trial was to achieve a lesser sentence.

The post-conviction court decided on this issue as follows:

> With respect to evidence or additional evidence of the prior convictions, prior disciplinary infractions, or pending charges of prosecution witnesses . . . , counsel did not use all the evidence that there was, though the record still does not contain disciplinary records for Mr. Herman.[11] The [c]ourt agrees with the [P]etitioner that such evidence or specificity about such evidence usually diminishes credibility more than no or non-specific evidence. Such evidence or specificity, however, only becomes critical when there is no or insufficient corroborative evidence or there is reason to doubt the corroborative evidence.

We glean the following information from the trial record. At trial, the following colloquy occurred on direct examination between the prosecutor and Trotman:

---

[11] The Petitioner argued that trial counsel was ineffective in failing to obtain Herman's disciplinary records to show Herman "tried to bribe a Silverdale Corrections Officer by offering a $10,000.00 bribe to escape."

Q. Obviously you are incarcerated?
A. Yes.
Q. You have a number of cases pending, correct?
A. Yes.
Q. Who is prosecuting that by the way?
A. I guess you and [the trial judge].
Q. Have you been promised any deal whatsoever for your testimony?
A. No, sir.

Trial counsel then emphasized on cross-examination Trotman's pending cases, although he did not delve into any specifics, and Trotman's possible hope for reparations. The trial record further shows that the jury was aware that Herman was incarcerated at the time of the Petitioner's trial, serving a twenty-three-year sentence for possession of cocaine for resale. Mr. Herman further testified that he was familiar with "the cocaine business in Chattanooga" and that he had not received any promises in exchange for his testimony. On cross-examination, trial counsel emphasized Herman's present incarceration and hope for "a leaner sentence." Kordell Butler testified at the Petitioner's trial that he was serving a fifteen-year-sentence for felony possession of a firearm and drug distribution. According to Butler, he had completed service of most of his sentence. On cross-examination, Butler agreed with trial counsel that he had contacted the prosecutor's office in hopes of getting his sentence reduced. There was also testimony presented to the jury that Butler was waiting to testify in an unrelated murder prosecution. It does not appear from the trial record that Mark Calhoun was questioned about his criminal past at the Petitioner's trial.

We cannot disagree with the post-conviction court that specificity of these prior records may have been of benefit to the Petitioner at trial. However, we feel constrained to note that the jury was aware that these witnesses had prior criminal histories and of their possible motives to fabricate testimony. Although specifics may have been more beneficial, we again are not convinced that the Petitioner received deficient performance in this regard.

Information challenging the credibility of the jailhouse informants was presented to the jury. This court determined that the evidence was sufficient on appeal. See McClure, 2008 WL 793787, at *8-9. The Petitioner's allegation again simply amounts to a claim that trial counsel should have done more. However, we agree with the post-conviction court that the Petitioner has failed to establish that he was prejudiced by this alleged deficiency.

*V. Jail Records of Inmates' Locations*

Next, the Petitioner argues that trial counsel was ineffective "in failing to review the jail records to verify the location of the 'jail snitches' at the time of the alleged conversations with the [Petitioner], to determine if they were in the same cell as [the Petitioner] during the

-35-

relevant time period." The Petitioner notes that trial counsel testified he did not know of any way to check jail assignments, that Lt. Coppinger provided the jail records for the relevant time period at the post-conviction hearing, and that, according to those records, Butler did not start writing letters to the prosecutor's office until six weeks after he was last housed with the Petitioner. He submits that "[a]ttacking Butler's credibility therefore was critical in creating reasonable doubt as to the alleged confession."

The State replies that the post-conviction court "properly determined that the [P]etitioner proved no claim concerning the impeachment of the jailhouse informant." The State notes that "[t]he [P]etitioner concedes in his brief that he was housed with Kordell Butler, and that Butler had an opportunity to hear any confession[,]" that trial counsel testified that he reviewed Butler's letters to the prosecutor's office, and that trial counsel focused more on the witness's motive to fabricate a confession in order to get a reduction in his sentence.

In this regard, the post-conviction court made the following finding:

> With respect to jail records of the [P]etitioner's and Mr. Butler's housing assignments . . . , none of the records establish Mr. Butler's lack of opportunity to converse with or overhear the [P]etitioner in jail. The housing-assignment records reflect that the [P]etitioner and Mr. Butler were housed together for about a month in the fall of 2004 . . . .

We agree that the Petitioner has failed to establish deficient performance in this regard.

### VI. Interview State's Witnesses

The Petitioner makes the broad assertion that trial counsel was ineffective "in failing to interview state witnesses." Trial counsel testified at the post-conviction hearing that he did not interview any State's witness, except possibly a detective, although he could not recall the details of that interview. Trial counsel further stated that he had reviewed the police reports and that he "knew what the detectives were going to state." Regarding Det. Narramore, trial counsel had heard his testimony at a pretrial hearing. Trial counsel also confirmed that he had a list of State's witness and was aware of who would testify at trial. According to trial counsel, he did not attempt to interview any of the State's witnesses because they were usually uncooperative with the defense in his experience. The criminal defense expert testified that trial counsel should have at least made attempt to interview the State's witnesses.

The post-conviction court ruled in this regard, "With respect to interviews of prosecution witnesses . . . , apparently, counsel's omissions did not deprive the defense of

important information or evidence." We agree that trial counsel should have at least made an attempt to interview the State's witness. See Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) ("[I]n most cases a defense attorney, or his agent, should interview not only his own witnesses but also those that the Government intends to call, when they are accessible.") (quotations omitted). However, trial counsel testified that he was prepared for trial and knew what the witnesses would state. Moreover, the Petitioner does not point to any additional evidence trial counsel would have discovered if he attempted to interview these witnesses. Again, the Petitioner has failed to establish prejudice.

### VII. State's Closing Argument

Next, the Petitioner argues that trial counsel was ineffective "in failing to object to [the State's] closing argument[.]" He notes the following two statements as objectionable during the State's closing argument: (1) "Who knows how many criminals are thinking about, hey, no witness, no case. Is that a good little business practice? They are watching this case right now to see what you do."; and (2) "A lot of people have stepped up to do this. You saw the fear I'm sure in some of their eyes and they are shaking. I know I did." Trial counsel acknowledged that this second statement was also in error but testified that he did not object to these statements "because it looks like you're trying to hide something from the jury." The State responds that the trial counsel "made a tactical decision well within his discretion to refrain from objecting to improper argument." Moreover, the State contends that the Petitioner failed to establish prejudice.

The post-conviction found deficient performance in this regard, determining as follows:

> With respect to closing argument . . . , counsel did not object to the prosecutor's references to general deterrence and personal observations of the fearfulness of witnesses. Such references and observations were objectionable. See State v. Hartman, 42 S.W.3d 44, 60 n.15 (Tenn. 2001) (describing a prosecutor's argument about "his own military experience and the need for general deterrence" as error).

However, this court has recognized, "[t]he decisions of a trial attorney as to whether to object to opposing counsel's arguments are often primarily tactical decisions." Derek T. Payne v. State, No. W2008-02784-CCA-R3-PC, 2010 WL 161493, at *15 (Tenn. Crim. App. Jan.15, 2010). In this case, trial counsel agreed that the statements made during closing argument were improper; however, he stated that he chose not to object. Moreover, trial counsel testified that he did not object "because it looks like you're trying to hide something from the jury."

Finally, this court has reviewed the State's closing arguments at trial. We conclude that, based on the five factors this court uses for determining whether allegedly improper argument is grounds for a new trial, see Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976),[12] the Petitioner would not have been entitled to relief even had trial counsel preserved objections and raised the issue on direct appeal. As our supreme court has made clear, an appellate court may not "overturn a verdict on the basis of a prosecutor's improper argument unless the impropriety affected the verdict." State v. Jordan, 325 S.W.3d 1, 65 (Tenn. 2010). Our review of the State's closing arguments convinces us that no prejudice resulted from trial counsel's failure to object.

### *VIII. "Catch-All" Argument*

Finally, as a "catch-all" argument, the Petitioner submits that trial counsel was ineffective "in the manner that was presented" at the various post-conviction hearings. In this section, he cites to "the testimony of [trial counsel], various other witnesses, including the Petitioner, Dr. Jeffrey Neuschatz, Daniel Kane, and all other documentary evidence submitted to the [c]ourt." It is unclear whether the Petitioner's argument is one of cumulative error. The State argued that "[r]eviewing decisions in hindsight does not reveal any deficient performance sufficient to even be accumulated."

In its order denying relief, the post-conviction court addressed the Petitioner's final argument of ineffective assistance "in the manner that was presented" in the various post-convictions proceedings. The post-conviction court found the additional instances of deficient performance:

> Finally, with respect to other post-conviction proof . . . , counsel did examine the [P]etitioner about inadmissable prior convictions. In addition, counsel did not object to cross-examination of the [P]etitioner about his failure to offer an alibi to police. See State v. [Daronopolis R.] Sweatt, [No. M1999-2522-CCA-R3-CD, 2000 WL 1649502, at *5-7 (Tenn. Crim. App. Nov. 3, 2000)] (describing a prosecutor's "initial question of whether the

---

[12] These five factors are as follows:

> 1. The conduct complained of viewed in context and in light of the facts and circumstances of the case. 2. The curative measures undertaken by the [trial] court and the prosecution. 3. The intent of the prosecutor in making the improper statement. 4. The cumulative effect of the improper conduct and any other errors in the record. 5. The relative strength or weakness of the case.

Judge, 539 S.W.2d at 344.

defendant had 'ever once' told the story to any law enforcement officials during the months he was in pretrial confinement" as improper).

Counsel also did not exploit an apparent weakness in the investigation: the apparent failure of police to try to find anyone other than occupant of the other side of the duplex who had heard or seen anyone or anything.

We decline to parse the entire record to locate additional instances of deficient performance. This issue is waived. See Tenn. R. App. P. 27(a)(7).

## CONCLUSION

The Petitioner has failed to prove by clear and convincing evidence that he received the ineffective assistance of counsel at trial. We, therefore, affirm the judgment of the post-conviction court denying relief.

_____
D. KELLY THOMAS, JR., JUDGE